And I have 48 seconds left, which I'll yield to one of my colleagues behind me, unless you have any further questions. Thank you. Thank you for your time. Thank you, Your Honors. You are the latecomer here, aren't you? I'm sorry. You are the latecomer here, aren't you? Yes, Your Honor. We adopted our Carolina baseball logo in 1997, and the latecomer with respect to all three of the applications. Now, we have an argument that we can tack back uses of SC a lot earlier, but we really don't address that issue here. Three very quick points. How do you overcome that? That's always a pretty important point for trademark law. Yes, Your Honor. But the way we overcome it is in direct answer to Judge Wilkins' question, which is if they lose the gift-giving and fair-weather fan issue, then there's a finding by the TTAB that all the other purchasers would not be confused, that they would be able to distinguish. What Stimler said is there are really three groups of people. There's fair-weather fans and gift-givers on the very end. In the middle, there are regular fan students and alumni. No, they wouldn't be actually confused. There's a difference in the law between actual confusion and likelihood. Your Honor. And there are many reasons here why there might not be actual confusion, such as it's usually displayed with the team colors. It's usually displayed with team logos. It's usually displayed in ways that militate against the confusion. But when you have legally identical marks, don't we have to weigh that heavily in the different question of whether there's a likelihood of confusion? I hear you, Your Honor, because what the TTAB found was that, quote, many, M-A-N-Y, close quote, purchasers would be able to distinguish these marks. That's the TTAB's finding. And so if the gift-giving relatives and fair-weather fans go away, the finding by the TTAB is that everybody else would be able to distinguish the marks. And therefore, if they would be able to distinguish, there's no likelihood of confusion. And that's what the case rises and falls on. Thank you, Your Honor. Thank you. Case is submitted. The next case will be 09-1234-1235, Nucor Corporation of the United States. Good morning. May it please the Court, I'm Daniel Pickard of Wiley-Ryan here this morning on behalf of Nucor. The central issue on appeal here is whether a federal agency is free to disregard the legislative purpose of the statute that it's charged with governing. Specifically, the ITC is required to make a determination whether imports from various countries should be cumulated together in determining whether those imports are likely to result in material injury to the domestic industry. The legislative history, subsequent case law, and it appears to all parties to this action, agree that the primary purpose of the cumulation statute is to determine whether the imports from the various countries will result in a hammering effect on the domestic industry. In Sunset Reviews, the Commission has discretion whether to cumulate those imports. Our position has consistently been that that discretion is not unfettered, that the Commission in exercising its discretion must do so consistent with the purpose of the statute. That is, an examination whether subject imports will have a hammering effect on the domestic industry. So the statute doesn't have an alternative purpose of considering the conditions of competition and weighing that in the balance? There is no mention of that in the statute whatsoever, Your Honor. Well, or in the legislative history? The legislative history is clear that it is the hammering effects that is the principal purpose of cumulation, and that's been reinforced through several decisions of the ITC's review in the courts. But if we look at the statute, looking particularly at the cumulation part, it requires the Commission to make some judgment as to whether they are likely to compete with each other, right? Correct. Why isn't that the basis to sustain exactly what they've done? They have merely made the judgment that Korea and Germany compete, Japan, Canada, and the rest don't. The Commission is free to exercise its discretion and view additional factors which could be relevant to the conditions of competition, as long as it meets two requirements. One, that it's relevant to the underlying purpose of the statute. And two, that they explain, they provide a reasoned discussion why these factors are relevant to the purpose of the governing statute. Because if it doesn't do so, really it turns the agency into a black box. If any difference in the conditions of competition are sufficient to satisfy or defend a determination to decumulate or cumulate, the agency really becomes a black box. It was a pretty long opinion to criticize for lack of explanation. The cumulation analysis, I would suggest, was somewhat abbreviated, and that nowhere in the cumulation decision is there any reasoned discussion that goes to the central and primary purpose of the cumulation decision. What about the court below? There's a long opinion there as well. There was a long opinion in the court below, and I believe that the court's opinion itself shows perhaps some misunderstandings of the arguments that were put forth before it. At no point have we ever argued that there's a lack of discretion by the ITC. It's just not unfettered discretion. They cannot choose to cumulate for any reason or no reason whatsoever. The Supreme Court has been very clear that the exercise of discretion by federal agencies must be consistent with the language and the purpose of the statute. It's important because— But the Congress not only gave them authority to determine whether there's a likelihood of competition. They also said they may cumulate. They gave them ultimate discretion with the judgment of cumulation, didn't they? Why should we here on appeal question discretion that was given them by Congress? It's crucial for this court to question that because it's not unfettered discretion. If they can choose, if the ITC can decumulate for any reason whatsoever— What in the statute limits that discretion? I'm looking at 1675 here. What limits their discretion? It's not on the face of the statute itself, Your Honor. It's a long-standing precedent of the reviewing courts. For example, there is nothing in the statute itself that specifically says that the ITC should not administer this statute corruptly. But clearly, that would be an unlawful exercise of its discretion. Similarly, if it did so in an arbitrary and capricious manner, that would be an unlawful exercise of its discretion. We maintain that the exercise of its discretion, divorced from, devoid of the Congressional purpose, is also unlawful. May it please the Court, I'm Stephen Vaughn, representing U.S. Steel. I can take your question, or I was also going to respond to your question about the— Please respond to Judge Wilk first. I was just curious from your brief, which addressed sort of policy and analysis and so on, but didn't actually get down to brass tacks as to what is really wrong with the result. Is the result contrary to policy? Is there something actually factually wrong with the result that was reached? Yeah, let me explain what— You didn't talk anything about percentage of tons or percentage of competition or— Well, what we wanted to do— Volume or any of that. We think this presents a straightforward legal issue. We had some factual challenges below, but what we wanted to present to this Court is a straightforward legal question. And it's going to give you a sense of what's wrong. Let me explain what they're actually doing. What happens is this. Judge Rader had a question about, you know, there's language in the statute about how they have to find that there's competition. Here, they did in fact find that that statutory factor was met, that there's a reasonable overlap of competition. They also found that imports from every subject country would likely have a discernible adverse impact. So those two statutory factors, which are the two thresholds for accumulation, both of those were found. There's no objection up to that point. What is happening at that point is the black box. What they have done is they have taken the word may and they have expanded it to represent a practice whereby they can mix and match these countries for any reason. All they say in this opinion is that there are different conditions of competition. But they didn't give us a black box. They talked about how the situation in Australia, France, and Japan had been a steady decline and how Korea and Germany had continued to incline. They talked about the larger impact of the market of those two, the lesser impact on the market of the other two. I'm reading the record entirely differently perhaps. No, no, no, that's a very good question. But let me just explain what's going on. This is a big record. They collect a lot of data on these countries. They can always find differences between country A and country B. They can always point to some factor that's going to distinguish one country from another country. The point is we don't know, going into it, what factors they're going to look at. We don't know what factors they're going to find relevant. We don't know what the standard is as to how they figure out which factors are relevant. The division between Australia, France, and Japan versus Korea, Germany, no one briefed that. No one asked for that. No one knew that was coming. But there's a pretty logical distinction. The three are going down at remarkable rates. The other two are coming up at remarkable rates. But they looked at these same countries in 2000. Why wouldn't you have briefed that is my question. Why wouldn't you say there's a difference but not that big a difference or whatever argument you want to make. Because it's literally not possible to brief all the potential combinations of countries that they could have come up with. Just thinking about it. It's a pretty big distinction. Two going up, three coming down. But there's a lot of other evidence and there's a lot of other distinctions in the record. For example, Japan, in the original investigations, they were a much bigger player in this market, say, than Australia. Or France and Germany are in Europe, whereas Japan and Korea are in Asia. The point of it is they have interpreted this thing in such a way that we don't know what they're going to do beforehand. And once they do it, all that's left for the courts is to say, well, yeah, I guess these numbers are different from these numbers. I guess you filed post-hearing briefs. Well, no, ma'am, because, Your Honor, the way it works is that we file our pre-hearing brief. They have the hearing. Then we file a post-hearing brief. Then they decide. No one knew until they voted. No one had briefed Australia, France, and Japan should be over here. Korea, Germany should be over here. Until we went to the vote, no one knew that was going to happen. No one can know. They looked at these exact same countries in 2000 and found all the conditions of competition were the same. Under your theory, if there were a group of companies like this, five countries, and four of them had made vast efforts to improve and had declined vastly, and one of them had shot up, you would hold the four responsible for the actions of the one country, right? Not necessarily. You would deprive at least the commission of the discretion to take that into consideration. With all respect, Your Honor, I don't think so. All we are saying— Well, then what are you saying? All we've said is— You want them all together. No. What we've said is that we need, from this Court, we need a legal standard that we can brief to and that you all can review. We don't create legal standards. That's in the statute, and it says you may. But the statute read in, we think, is a basic principle of statutory interpretation, that they cannot exercise their discretion or interpret the statute in a manner that defeats the purpose of accumulation. If, in your example, they lay out for the Court— But what if the accumulation is not hammering, is the point? Three of them are coming down. They're not hammering. The two may still be hammering, and so you keep those together. But that seems to be what the commission said, and why should we second-guess that? Okay. Because, first of all, they have to decide what's going to happen once the orders are revoked. If they come out and they say, we've looked at this, and we find that they will compete with each other, and we find that imports from every country will have a discernible adverse impact, but, based on these factors, we don't think there's actually going to be a combined hammering effect, that's a decision that the courts can review. That's a decision that we can sort of brief, a standard that we can brief to, and that's consistent with the legislative purpose of accumulation. And right now, that's what we don't have. What happens is they come out and say, these countries are different from these countries, therefore we're not going to accumulate. What was your position? They should all be accumulated together, or nobody should be accumulated? The domestic industry generally took the position that the commission should accumulate all six countries, just as it had done in 2000. The Japanese producers, for example, they said Japan should be decumulated. Other countries said that they should be decumulated. What no one did was to say you should put Australia, France, and Japan together, and you should put Korea and Germany separately. What's your answer to their waiver argument? Well, I think that if you sort of, there's a couple of things. First of all, one point that was made at the hearing was, well, Canada might actually ship more than the other countries. And we said very clearly at the hearing, we said you can't decumulate somebody on the grounds that they're going to have more of a hammering effect. So we made it clear that the hammering effect, in our opinion, was something that the commission should consider. And the other thing, to be honest, Your Honor, there wasn't a way for us to know what they were going to do. Our objection is not to the exercise of discretion. It's not even really to the conditions of competition or looking at conditions of competition in order to exercise your discretion. Our objection is applying discretion in such a way that we can't know what's going to happen and we can't know what they're going to say. All right. Mr. Fishberg, you divided yours in half as well. Ten for you, right? Five for you? Ten for me and five for my colleague, yes. Thank you. May it please the Court, good morning, Your Honors. My name is David Fishberg, and I am here today representing the International Trade Commission in this action. The issue before you today is whether the commission's consideration of likely conditions of competition as part of its accumulation analysis and sunset reviews is a permissible interpretation of the statute and in accordance with the law. The simple answer to that question is yes. Once you've decided that they're likely to compete, how do you get around the likelihood of hammering effects as well? In other words, if you were going to make this decision, shouldn't you have decided these three really don't compete the same way as Korea and Germany? Judge Rader, I would posit that that's exactly what we did find. We found that there was an overlap of competition, a certain baseline of competition between all the countries that got us past this likely-to-compete language in the statute, which is an exception to accumulation. But even if Congress made very clear that even if you were to find that, the commission, as you pointed out, still may accumulate. It doesn't require us to accumulate. And what appellants have done in this case is they've tried to transform language from present injury determinations, where Congress made very clear that if these two factors are met, you shall accumulate, and try to put that language into sunset reviews, which is a different analytical framework than present injury investigations, where Congress said you're doing a predictive prospective analysis where even if these two factors are met, you may accumulate. And Congress didn't tell us, here are the factors that you need to look at to accumulate. Congress left it to the commission, and our reviewing course below have recognized that the commission therefore has wide latitude in terms of the factors it looks at for the commissioners to therefore exercise discretion in the end and determine whether or not it will accumulate countries. As Judge Wilkins said before, we have appellants with domestic-interested parties coming into us all the time, and their position is always accumulate all the countries together. And we have respondent parties coming into us telling us don't accumulate any of the countries together. And it's the role of the commission to look at the record evidence. Imagine that, looking at the record evidence before it and saying these countries are competing in a certain manner and therefore we're going to accumulate them together, and these other countries are competing in a certain manner and therefore we're going to accumulate them together. But just because a party has argued we should accumulate everyone together or not accumulate anyone together doesn't mean the commission is bound in any way to do what the parties are asking us to do. Mr. Pickard and Mr. Vaughan invite this court to set some standards on the discretion of accumulation. First of all, Your Honor, that's not in the statute. If Congress wanted the commission to look at any specific factors it would have put it in the statute. But of course there is a standard that our reviewing courts use. It's an abuse of discretion standard. So when appellants come up here and tell you that the commission looks at any factors it wants to, that's not the case and wasn't the case in this specific case at hand. In fact, the commission looked at factors that it looked at in the past and these factors have been affirmed by the lower courts. Factors such as differences in volume and price trends, differences in the level of corporate affiliation. So the commission is not just looking at any factors out there, it's looking at factors that will have a bearing on how these imports are likely volume and price trends for these imports in the market. And this is not a new or novel theory that the commission just came up with. In the very first Sunset Reviews back in 1999, a case Sugar from the European et al., the commission laid out its analysis very clearly and said in a prospective analysis the commission is going to look at how these imports are going to compete. It's going to look at such things as differences in volume and price trends. And this has been very clear. So for appellants to come in and say it's a black box, we have no idea what the commission is going to look at, they do have an idea that it's a very finite number of factors that the commission looks at. And in this case, the commission looked at factors that the parties argued to us. Appellants themselves set up their briefs in a manner where they addressed whether or not subject imports were going to have a discernible adverse impact, whether or not they were likely to compete, and then they addressed conditions of competition. And they argued to us they're all going to have similar conditions of competition. And respondents came into the commission and argued, no, none of these countries are going to have similar conditions of competition. The commission did a very nuanced analysis in this case, and as Judge Wilken pointed out, a very long analysis. It's a long opinion. There's six pages alone on accumulation where the commission went through the reasons, went through the factors that were argued to us by the parties in detail, discussed those factors, and then came to a conclusion, as Judge Rader pointed out, that these three countries show an interest in the U.S. market, or these two countries, Germany and Korea, show an interest in the U.S. market, while these three countries, France, Japan, and Australia, are not showing an interest in the U.S. market. Is it unfair to a party to not know where or how the commission in advance, how the commission might accumulate or divide? I think every party would like to know that. I'd like to know that of this court. I don't think it's unfair to know that. But to tell us that the standard is that the party, or to make an argument that there's a black box out there because they can't plug in a mathematical formula and know how the commission is going to come out is not the standard here. It's whether the commission's analysis was reasonable. And we relied on factors on the record. The appellants aren't even arguing that the facts we relied on are wrong. It'd be one thing if they were coming to this court and saying the commission and our lower court, they said there were differences in volume trends, but there weren't. Actually, the volume trends were going the same way, whether there was a commission relying on a difference in corporate affiliation. But that's not true. That's not what they're arguing here. So for them, again, to come up with an argument that's a black box, when, again, they themselves argued these very factors. They responded to the respondents at the administrative level. They responded to these arguments. So the commission had a record before it where these issues were addressed to it. So again, I don't see how appellants can come in with that argument. Setting aside whether one needs to find this in the legislative history, do you find anything in the legislative history addressing a policy of considering conditions of competition as well as hammering? Well, I think that explicitly in the language of the accumulation provision in Sunset Reviews, the ability not to accumulate even if the two statutory factors were met. And I think the commission, again, in its very first Sunset Reviews, came up with this conditions of competition analysis where it said, we're going to look at how these imports are actually competing because what we're doing is a predictive analysis here. In Sunset Reviews, we're looking at what's likely to happen. It's a counterfactual analysis because there's an order in place. So there's a degree of speculation and a predictive nature in this analysis. So what the commission said is, we're going to do a further analysis to assure ourselves that our accumulation decision is not just based on inherent speculation, that it's actually tied to the facts on the record and it's tied to substantial evidence that the parties are arguing. The how it affects language that appellants are pointing out is just one piece of legislative history that came out in present injury determinations. But is there something in that same legislative history that addresses other conditions of competition? Well, I think, actually, it's not the legislative history. It's actually the language of the statute, which tells us to look at competition. And competition is a vital element of the statute. So we go and we look at competition, how these imports, likely competition, how these imports are likely to compete in the future. So we don't need to rely on legislative history. We actually look at the language of the accumulation provision itself. And I think there's a big issue that we have when appellants come up and say, the sole purpose of Congress was to address hammering effects. We do not think that that's the case. As we point out, in threat determinations, which the commission had been doing since the late 1980s, it was also looking at volume and price trends. And a threat analysis is also a predictive analysis, where we're trying to see what's going to happen in the imminent future. And in the threat analysis, the commission was doing this test in the late 1980s, had been doing the test for six years by the time Congress and the URAA statutorily said, we are preserving your discretion to conduct this analysis in the threat context. Had Congress in any way been concerned with us not accumulating countries based on volume and price trends, I don't think they would have told us, we're preserving your discretion in this context. And then Congress went beyond that and said, we're crafting the sunset provision in 1994 to give you the same amount of discretion that you have in the threat context. So for them to come up here and say, the sole purpose of accumulation is to deal with hammering effects, when Congress actually gave us the threat context, we just fundamentally disagree with that. All right.  Thank you, Your Honor. Thank you, Wood. Thank you, Your Honor. Good morning. I'm Chris Wood, appearing on behalf of the Japanese respondents. And obviously, we concur completely with the ITC's interpretation of its governing statute. I'd like to just add one or two points on this argument that I've raised by the appellants, that the accumulation process is something of a black box where parties genuinely do not know how to frame their arguments. As a practitioner, I think that's overstated somewhat. You can go back to the very first sunset review in which the commission addressed accumulation. And I think the commission laid out very clearly what its approach was going to be. It's that they're not looking at random factual distinctions, they're looking at specific conditions of competition that bear on likely future volume trends and likely future price trends. And now that we have 10-plus years of sunset review precedence out there, it's really quite reasonable to expect that you can look at what the commission has done in the past, frame your arguments in the light of the specific product and industry which you're representing, and argue from a respondent perspective that the conditions of competition affecting your particular industry are in fact quite different than those affecting any other country. What about the notion that one could accumulate in various different ways and nobody thought of or argued for the way they did accumulate? What were you arguing for and how did you decide what to do and what they might do? Well, my role as counsel to the Japanese respondents is to attempt to get the commission to look at the Japanese respondents individually. I am most familiar with the conditions of competition that affect those producers. I can argue as to our trends. I can argue as to why we believe we are differentiated from other countries that are subject to the review. But in the final analysis, it's the commission that is looking at the entire record, and it is particularly within the expert judgment of that agency to draw whatever conclusions it believes are most reasonable on the facts. So you didn't posit certain groupings that you favored? No, that's frankly outside the scope of our role on that. But it's well within the commission's exercise of its own discretion. If I could take just a couple of minutes and turn to our exhaustion argument, because we really do think there is a fundamental problem with the very premise of this appeal. And that problem is that the appellants are asking this court to strike down a long-standing, consistent practice of the statute, consistent interpretation by the commission of its governing statute, on grounds that were never presented to the ITC for decision. It implicates both of the core reasons that there is an exhaustion doctrine, both to protect the authority of administrative agencies to announce its own rules and explain its reasoning, and also to promote efficiency in judicial review. But you mean waiver. You're referring to it as waiver or exhaustion? I refer to it as exhaustion in the sense that I do not believe that the appellants ever said to the commission that we believe your consideration of conditions of competition without an express tie to hammering effects violates your statutory mandate. They give a couple of sites where they say they said that, once at the hearing and twice in post-hearing briefs. Well, that's right. Let me address both of those. I believe Mr. Narcan addressed the testimony at the hearing. Which relates to a comment where, as counsel represented, the domestic industry argued that the Canadian imports would have a heavier impact due to their higher volumes and that they would have a greater hammering effect for that reason. But I don't think that's enough to put the commission on notice that their entire analytical model was being called into question. I mean, it was specific to Canada. The commission's determination with respect to Canada is not even at issue on this appeal. That's not one of the countries that was appealed. With respect to the post-hearing brief sites, the Nucor brief simply cites in a footnote to that statement from the hearing but does not elevate it into a broader argument about the commission's overall statutory interpretation. And I will confess that when I reviewed the U.S. Steel post-hearing brief site, I could not see that that argument was raised at all. The part that they cited appears to be a response to a question asking about whether material injury would be likely to reoccur even if the commission chose not to accumulate any of the countries. So we don't think that that's there. We think that essentially all of the conditions of competition that the commission found persuasive in this case were ones actually raised in the briefs by the parties so that if at any point the appellants believed that consideration of those factors would somehow be ultra viris of the commission's authority under the statute, they absolutely had a potential to raise those issues and the obligation so that the commission could, in the first instance, weigh in on those arguments. Thank you very much. Your Honor, what you've heard from the other side is that we look at a lot of conditions of competition and that these conditions of competition can lead to differences. But what you have not heard from the other side is what those differences have to do with accumulation or the purpose of accumulation. Let's assume, for the sake of the record, that imports from Australia, France, and Japan are going to be lower in volume than imports from Korea and Germany. The whole point of accumulation is that small volumes of imports from different countries can add together and have a hammering effect and hurt domestic producers. The mere fact that some countries might ship fewer imports than other countries has nothing to do with accumulation. And this is the whole problem. What we are asking is that if they want to decumulate, if they want to exercise that discretion to decumulate, they have to explain what their decision has to do with the purpose of accumulation.  We cite a brief that they filed at the ITC, at the CIT, in which they acknowledged that the hammering effect is a purpose of accumulation, but that they don't consider that as something that they necessarily have to address. That is the whole issue here. I'm sorry, where does it say that? It's on page 26 of our brief, where we cite a brief that they filed at the Court of International Trade. That's the whole issue here. All we ask is that when they exercise this discretion to decumulate, once they've found there's going to be an overlap of competition and once they've found that all the imports from every country are going to have a discernible adverse impact, give us an explanation about why the reasons on which you rely are relevant to the purposes of accumulation. Thank you. The case is submitted. Thank you. Thank you. The next case will be 097068. Hawkins will be the Secretary of Veterans Affairs. Mr. Morton. Yes, Your Honor. My name is Myers Morton. I'm from Knoxville, Tennessee. Elmer Hawkins is a Vietnam veteran who was exposed repeatedly to Agent Orange. He has very nasty ailments. It's difficult for him, and I've described it in my brief. He has a very difficult time. He filed a claim to be compensated 19 years ago. Nineteen years. And the VA, since that 19 years, have been disrespectful, have played games, and have ignored his claims.